EXHIBIT  4

AMERICAN ARBITRATION ASSOCIATION
EMPLOYMENT ARBITRATION TRIBUNAL

PAMELA HERRINGTON,
    Claimant,
    v.
WATERSTONE MORTGAGE CORP.
    Respondent.

AAA Case No. 02 14 0000 4860

## PARTIAL AWARD ON HERRINGTON'S INDIVIDUAL CLAIM

February 20, 2020

## PROCEDURAL BACKGROUND

This arbitration was commenced in March of 2012 by Claimant Pamela Herrington, acting "individually and on behalf of all others similarly situated", against Waterstone Mortgage Corp, who was the employer of the claimant class of loan originators ("LOs") who sought damages for unpaid minimum wages, expenses, and overtime. After a protracted pre-hearing period that included a disputed class certification, several unsuccessful attempts by Waterstone to obtain court review, extensive depositions, and document discovery, a three-day evidentiary hearing of the claims of 220 opt-in claimants was concluded on December 21, 2016.

The procedures followed in the vigorously fought pre-hearing period are summarized in the Partial Final Award on Liability, dated April 13, 2017. That award concluded that Waterstone was liable under the FLSA for unpaid wages, expenses and overtime; that Waterstone's claim of outside sales exemption ("OSE") had been waived and was barred by estoppel; and that claimants' claims under Wisconsin law and the parties' employment contracts were dismissed.  Issues of damages and attorney's fees were reserved for later determination.

After interim awards on damages on June 12, 2017, and attorneys fees on July 5, 2017, a final award was entered on July 5, 2017, that directed Waterstone to pay $7,267,919 to claimants' counsel, to be distributed among the opt-in claimants, $3,318,851 to Claimants' attorneys for fees and costs, $20,000 to Pamela Herrington as an incentive fee, $18,175 to the AAA as an administrative fee, and $438,077.94 for the arbitrator's fees.

The court proceedings that followed were summarized in the ORDER ON MOTION TO DISMISS FOR LACK OF JURISDICTION, dated June 12, 2019, as follows:

> Herrington moved in the Wisconsin District Court to
> confirm the award.  Waterstone moved to vacate or in the
> alternative to modify the award.  Its grounds for vacating were

2

alleged bias of the arbitrator in creating and relying on a survey in connection with class certification, and misconduct in the form of sleeping during the hearings.  Its ground for modification was a $20,000 mathematical error in the award, which was not contested by Herrington.

The district court confirmed the award in December 2017, and Waterstone appealed to the Seventh Circuit.  Herrington asserts that the only issues raised by Waterstone on the appeal were the same ones tendered to and rejected by the district court on its motion to vacate the award.  The appeal was argued on May 29, 2018.  Eight days earlier the Supreme Court had reversed a Seventh Circuit case, Lewis v. Epic Systems Corp, 823 F3d 1147, which had held that the waiver of class or collective claims in an arbitration agreement was invalid as being in conflict with the National Relations Act.  As a result, the Seventh Circuit decided:

> Because the district court erred in invalidating the waiver clause in the parties' arbitration agreement, we vacate the district court's order enforcing the arbitration award.   On remand, the district court should conduct the threshold inquiry regarding class or collective arbitrability to determine whether Herrington's agreement with Waterstone authorizes the kind of arbitration that took place.  If the district court determines that the agreement allows such an arbitration, our decision leaves the district court free to confirm the award.  If, however, the district court determines that Herrington's agreement with Waterstone requires single-plaintiff arbitration, it should vacate the award and send the dispute to the arbitrator for a new proceeding. [Order of 6/12/20 at pp 3-4].

Following the Court of Appeals' direction, the district court on April 25, 2019, determined that the parties' agreement, with the waiver clause

3

reinstated, did not authorize or permit class or collective arbitration. It denied Herrington's requests for judgment on her individual claim based on the then-existing record and for leave of other class members to intervene, vacated my award of July 17, 2017, and ordered that "Plaintiff's claims must be resolved through single-plaintiff arbitration." The district court also said, "Because it is clear that plaintiff's entire dispute must be resolved by arbitration, I will direct the clerk of the court to close this case, subject to reopening for purposes of confirmation of or challenges to the arbitration decision." [6/12/19 order, pp 3-4].

Herrington's counsel, Getman, Sweeney & Dunn, PLLC, who have represented Herrington from the beginning, then sought to proceed with the individual claim before me. Represented by new counsel, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Waterstone opposed and contended that an entirely new arbitration, with a new arbitrator, was required. The dispute over the type of proceeding and its resolution are described in the above-referred to order of June 12, 2019 at pages 4 – 7. I concluded that this was a continuation of the proceeding which Herrington had commenced in 2012, acting individually and on behalf of the class, and that as the duly appointed arbitrator under the parties' employment

agreement I should continue to serve as the arbitrator for this individual phase of the arbitration.

After briefing and argument, it was determined that a hearing was required to provide the needed evidentiary basis for adjudicating Herrington's individual claim, in contrast to her claim as a class member. The order of August 8, 2019 provided:

> This arbitration was begun by Herrington asserting claims on behalf of herself individually <u>and</u> of others (a class) similarly situated.  The prior hearing and award focused on the class claims, which also incorporated Herrington's individual claim as part of the class.  But no separate analysis or attention was then focused on her individual claim.
>
> The court vacated the final award.  Although the judgment was vacated as a whole, I interpret the clear intent of the court to be that there should not have been an arbitration of the class claim at all, but that Herrington did still have her individual claim, which can be dealt with in further proceedings.  So, the court remanded the matter for further arbitration.
>
> Waterstone urges strict adherence to the rules of evidence in the upcoming hearing.  But this is arbitration, where in the interests of convenience and expedition the rules of evidence are relaxed and sometimes disregarded.  So in order to bring before me at the hearing all the information that I will need to make the necessary findings and conclusions, I will permit in evidence any part of the evidence in the prior hearing, offered by either party, that is relevant to the individual claim. In addition, either party may submit additional

> evidence.  On the basis of all the evidence
> presented (from prior hearing and new), I will then
> be able to make an award.  [Order of 8/8/19, p 2]

This analysis of the nature of the individual evidentiary

hearing was expanded upon in the order of August 30, 2019, as

follows:

> As previously indicated, the hearing will be a
> continuation of the existing arbitration.  Findings
> in the class award will not be regarded as
> binding, and the hearing record will be open for
> Herrington to present evidence to prove her
> case, and Waterstone will be free to challenge
> Herrington's evidence and present any
> additional evidence pertinent to its defenses.
> Either party may offer any part of the record from
> the class-phase hearing.  The final award will be
> based on the evidence presented at the
> upcoming hearing.  [Order of 8/30/19 pp 4-5]

The hearing on Herrington's individual claim was held on November 18,

19, and 20, 2019.  Both sides indicated what portions of the class hearing

should be considered as part of the record.  In addition, Claimant presented

testimony from Pamela Herrington and Jason Kandel.  Waterstone presented

testimony from four witnesses: Emilio Cosculluela, Doug Chauncey, Paul

Zimmer, and Eric Lee.  Following the agreed schedule, as amended, the

parties submitted simultaneous post-hearing initial briefs on January 10,

2020, and reply briefs on February 5, 2020.

I have carefully considered all of the parties' submissions and make the following decision and partial award after due deliberation.

## THE PARTIES' CONTENTIONS

Through their initial and reply briefs, the parties have presented their contentions and arguments with respect to Herrington's individual claims for unpaid wages, expenses, and overtime.  Herrington contends that, during the eight-plus months she was employed by Waterstone, she worked an average of 70 hours per week and incurred expenses on behalf of Waterstone at the average rate of $187.50 per week.  As a result, she contends, she suffered damages from unpaid wages, unreimbursed expenses, and unpaid overtime. She bases her claims on the Fair Labor Standards Act, the Arizona Wage Hour Law, and/or principles of contract law.

She contends that Waterstone's OSE defense cannot be maintained, because the ruling in the class phase is binding under the "law of the case" doctrine, but even if Waterstone could assert the OSE defense in this individual phase, the defense would again fail under principles of waiver and estoppel.

In reply to Waterstone's evidence and argument that, in fact, Herrington never worked overtime, she asserts that Waterstone has failed to satisfy its

burden of overcoming Herrington's evidence on hours worked and expenses incurred and that a decision in her favor on these issues is required "as a matter of just and reasonable inference."

Waterstone opposes all of Herrington's claims on both procedural and substantive grounds. Procedurally, it has argued from the beginning of the individual phase of this arbitration that the entire procedure should have been conducted under a separate arbitration, based in Wisconsin, and with a new arbitrator selected. It rejects Herrington's law of the case argument, and argues that Herrington improperly relies on "Collective Evidence" and post-hearing evidence.

Addressing the substance of Herrington's individual claims, Waterstone argues that as an experienced loan originator, Herrington accepted her position knowing that Waterstone did not pay overtime; that she was working as an exempt Outside Salesperson; that in actuality she worked only part-time and did not even earn the minimum wage for the 40 hours for which she was paid; that she failed to prove her alleged expenses; and that in any event she was not entitled to expense reimbursement.

With respect to the Outside Salesperson issue, Waterstone argues that it neither waived nor is it estopped from asserting the OSE that is available to it under the FLSA.

According to Waterstone, her contract claims fail because not only did she breach her two employment agreements, but also neither of those agreements provided for overtime or expense reimbursement.

Finally, with respect to her claims under Arizona law, Waterstone asserts that in the circumstances here she is barred from advancing those claims, and that even if they were applicable, they would fail for the same reasons her FLSA and contract claims fail.

## DISCUSSION

This case presents two main issues and several subordinate issues. The main issues are, first, whether Herrington actually did work more than 40 hours per week during the period she was employed by Waterstone, and second, whether Waterstone is shielded from overtime claims under the FLSA by the Outside Sales Exemption ("OSE").  Because it would be dispositive of virtually the entire case, if decided in favor of Waterstone, I shall address the hours-worked issue first.

## Did Herrington Work More Than 40 Hours Per Week?

Herrington completed the time-clock records required by Waterstone and for each week of her employment she reported 40 hours.  She

testified, however, that she and the other LOs were not permitted to record more than 40 hours, and if they attempted to do so they were corrected by their supervisor.  This testimony is corroborated not only by the fact that the Waterstone payroll records show consistently that nearly all biweekly salaries were calculated at the minimum wage on the basis of 80 hours, (exactly 40 hours per week), but also by the testimony of several other LOs at the class hearing that their supervisors prevented them from recording overtime hours.

According to Herrington's testimony, working primarily out of her home office, she spent on average 60 to 70 hours per week working on Waterstone's business.  That included time on Saturdays and Sundays. She also incurred expenses that averaged between $700 and $800 per month.  In the class-phase hearing, several other LOs testified to the overtime hours and expenses that they also had incurred.  Their job as an LO required more than 40 hours per week, although generally their claimed weekly hours were less than the 60-70 hours that Herrington claimed.

On the first day of the class hearing, with the prospect of hearing similar testimony from possibly 40 LO witnesses, the parties stipulated that each of the opt-in claimants had worked an average of 52.5 hours per

week.  That stipulation is not binding in this individual phase, but the fact that Waterstone entered into that agreement in the class phase is some evidence that it recognized that many of its LOs were, indeed, working more than the 40 hours that were recorded on each of their respective time records.

Over the nearly eight years this arbitration has been pending, Herrington has filed affidavits and other documents, been deposed, and has testified at two hearings.  Absent any personal time-keeping records, she necessarily had to rely on her memory of those days back in 2011 and estimate her average work week.  She presented several estimates of her working hours that ranged from 48.6 (40 plus approximately 259 overtime, which equals 8.6 per week) to "more than 60", "60 to 70", and "closer to 70".

Herington relies on the standard of proof established long ago by the Supreme Court for determining overtime hours in FLSA cases when a company fails in its obligation to keep accurate time records.  The lack of precise figures should not be held against the employee, who should be permitted to approximate her hours by summary testimony as the next best substitute, as a matter of just and reasonable inference.  [See: Anderson v. Mt. Clemens Pottery, 328 US 680, 687 (1946)].  She urges

that her testimony, in the context of the testimony of many witnesses at the class hearing and the fact that Waterstone's own records and witnesses establish that an LO needs more than 40 hours to do her job, provided a sufficient basis to shift the *Mt. Clemens Pottery* burden onto Waterstone to rebut her case.

In the individual hearing, Waterstone aimed most of its witness testimony toward its argument that Herrington was a part-time, not a full-time worker, and therefore could not be entitled to overtime compensation. It called three witnesses for this purpose: Chauncey, Cosculluela, and Lee, for this purpose.  The first two were co-workers in the same branch office as Herrington.  They testified that she rarely came into the office, that she talked about her horses and had hay in her truck, and that if she only closed three mortgages in the eight-plus months she worked for Waterstone, she could not possibly have been working even a full 40-hour week, because the mortgage market at that time was booming.  They denied that overtime work was necessary to do the job of an LO, although Chauncey and Cosculluela both did work on weekends.

Lee was Herrington's supervisor for part of her time at Waterstone. He gave similar testimony and in addition noted that the number of credit

pulls she made was significantly less than that of other LOs.  He also acknowledged that LOs often worked on weekends.

In reply to the evidence Waterstone presented through these three witnesses, Herrington advances several arguments.  Initially, she points out that the witnesses did not deny that they worked irregular hours or that the company had informed them they were "non-exempt" i.e., not subject to the FLSA's OSE.  She also attacks their testimony that she could not have worked more than 40 hours by pointing out that they had so little contact with her they could not have known what she was doing most of the time, and that in any event their testimony was based on what happened over eight years ago.  Furthermore, Lee was a co-worker of Herrington for only four months, and Chauncey for only three.

All three of Waterstone's witnesses expressed the opinion that Herrington could not have been working even a full 40-hour week because during her eight-plus months she closed only three loans.  According to them, the mortgage market in Phoenix at that time was booming.  She points out that economic statistics show that the housing market at that time in Phoenix was still deeply troubled after the 2008 recession. Herrington further shows that her performance was not unusual at Waterstone at that time because although during the period of her

13

employment there she closed three loans (indicated by commission payments), there were six Arizona LOs who received no commission payments at all.  Also, during the same period, Herrington received more in commission payments than 10 of the 20 employees in Phoenix.

Waterstone further challenges her credibility by characterizing her as a "litigation expert" and "serial plaintiff", and suggesting that she spent her time working with her "horses".  Herrington acknowledges that she had been connected with other employment lawsuits, but challenges the disparaging inferences Waterstone attempts to draw.

- The workman's compensation claim that Waterstone called "fraudulent" had been dismissed because there were "conflicts in the evidence" of causation that the Administrative Law Judge, after a hearing of several days, resolved against Herrington.  There was no mention or suggestion in the cited decision of fraud.  [Waterstone's Ex 91, p. 3].

- She was an opt-in plaintiff in a FLSA action against Freedom Mortgage where for two weeks her group was negotiating their hiring, but she never actually worked for them.

- She also sued Prospect Mortgage as a member, for failure to pay her overtime during the four months she worked.

All this litigation was during a period when the mortgage industry suffered extensive litigation over LO's entitlement to FLSA benefits.

After considering and weighing all the evidence, including both the testimony at the individual hearing and that designated by the parties to be included from the class hearing, I find and conclude, as a matter of just and reasonable inference, that Herrington worked an average of more than 40 hours per week, but that she did not work the 70 hours she now claims. I find as a matter of just and reasonable inference that she worked an average of 50 hours per week.

### Is Herrington's Quest for FLSA Protections Defeated by Waterstone's Claim to an Outside Sales Exemption?

There is no dispute that Herrington's work as an LO fits the FLSA's description of an outside salesperson. As pointed out in the class award, the LOs' claims would have been dismissed based on the OSE if it were not for the fact that I found that Waterstone had waived and was estopped from asserting the OSE. [Order of 4/13/17 at p. 23].

In the pre-hearing order of 8/30/19, I explicitly indicated that the findings of the class award "will not be regarded as binding" in this individual phase, but that either party might offer at the individual hearing "any part of the record from the class-phase hearing", and that

"Waterstone will be free to present whatever additional relevant evidence it desires . . . on [waiver and estoppel]." [Order of 3/28/19 at pp 4-5]. But Waterstone did not present any additional evidence bearing on its OSE defense, and Herrington has presented to me for evaluation the same evidence as it offered in the class-phase hearing.  The analysis and conclusions that followed, based on the evidence presented in the class-phase, were confirmed by the District Court and are equally sound here. As expressed in the Partial Final Award on Liability in the class-phase:

> Before 2010 Waterstone had compensated its LOs on a commission-only basis.  For some time, the mortgage industry had been going through a period of change.  In response to increasing government regulation Waterstone's competing mortgage companies' arrangements with their LOs varied.  Some used commission only.  Others paid a straight salary.  Some paid hourly wages.  And there were combinations of commissions, salary, and wages.

> In August 2010, based on advice from the same counsel that represented Waterstone in this arbitration, Waterstone began to move away from its commission-only type of compensation system for its LOs.  It began by reclassifying the majority of its LOs as "non-exempt", and structured its compensation for LOs around principles identical to the requirements of the FLSA – minimum wages plus overtime.  Later it expanded the "non-exempt" category to include all the LOs.

> Waterstone now argues that the change in system was not related to any need or desire to

comply with the FLSA.  But, from what, other than the FLSA and state regulations, would they be "exempt" or "non-exempt?  Clearly, Waterstone's intent was to treat the LOs as not exempt from governmental wage requirements.   There is no other persuasive reason for that classification.  In short, Waterstone's new system requiring LOs to report their time by hours was meant to satisfy the requirements of the FLSA and state-law wage and hour requirements as applied to its LOs.

As determined earlier, despite the new system, and despite the explicit requirements of its employment agreements and employee manuals, Waterstone knew and accepted that its LOs were consistently working more than 40 hours per week and that they were not reporting their hours accurately.  Waterstone knew, of course, that to the extent that a branch manager might allow overtime, his own compensation, which was related to the profitability of his branch, could be reduced.  In short, Waterstone permitted, or may have even directed, its branch managers to circumvent the overtime-compensation provisions in the FLSA and in its own contracts, by discouraging and forbidding LOs from reporting more than 40 hours.

Waterstone's President Egenhoefer and its Senior Vice President Allen acknowledged in their depositions that its minimum-wage-plus-overtime compensation system was adopted in order to comply with federal (i.e. FLSA) and state wage requirements.  At the hearing, however, they both told a story that the change from commission-only was solely so that they could use a new computerized compensation program.  I found their hearing testimony on this point to be incredible.

In making the change, Waterstone was obviously following the advice of counsel in how to

17

comply with government requirements.  It
established the much-disliked time-reporting system
in order to legally comply with minimum wage and
overtime regulations of the FLSA and state laws.
Then it tolerated or told its branch managers to
arrange so that the LOs would not report more than
40 hours.  In this way, Waterstone complied in form
with FLSA's overtime requirement, but in practice it
sought to avoid having to make the overtime
payments that otherwise would have been made.

In practical effect, Waterstone represented to
its LOs, not that they were exempt from coverage
under the FLSA as it now claims, but that they were
non-exempt and that it was providing for the
protections of the FLSA.  It is true, as Waterstone
repeatedly emphasizes, that most of the LOs either
were ignorant of or did not care about the
protections and benefits of the FLSA.  They
regarded their work as commission-based, and they
viewed the payments for hours worked as a draw
against the commissions they hoped to earn.  The
issue, however, is not how the LOs thought about
their compensation or what they signed on to in the
agreements prepared and required by Waterstone.
The FLSA is a collection of rules established to fix
the minimum compensation to be paid to employees
and to do so apart from what the parties might think,
understand, or agree to.  The FLSA thus overrides
both the employers' and the employees'
understandings to the extent that their mutual
arrangements in actual practice fail to satisfy the
minimum standards laid down by the statute.

By setting up its compensation system, by
representing to the LOs that they were non-exempt,
by classifying LOs as "non-exempt" in its job
description, by hiring new employees and permitting
others to continue to work for them after
establishing the new system, by tolerating and

encouraging the LOs' logging of inaccurate hours
into the system, and by continuing that conduct over
a period of years, Waterstone has both waived and
is estopped from asserting its OSE defense to
Claimants' FLSA claims.  Consequently,
Waterstone is liable to Claimants under the FLSA
for unpaid minimum wages, unpaid overtime, some
unreimbursed expenses, liquidated damages, and
attorney's fees and costs.  [Award of April 13, 2017
at pp. 20 – 23].

Interestingly, since the class-phase award, Waterstone, represented
by the new counsel in this individual phase, has sued for malpractice the
attorneys who guided it through the changes in their system for
compensating its LOs and represented it in the class phase.  In its
malpractice complaint, Waterstone confirms the class-phase findings,
alleging that former counsel had recommended that Waterstone "change its
employment agreements so as to treat the LOs as non-exempt under the
FLSA" and that "[b]ased on that advice"  Waterstone "drafted new
employment agreements for [its] LOs to execute", and that the new
agreements stated "that Waterstone would pay the employee minimum
wage for all hours worked in a given week up to 40 hours, and would pay
the employee overtime for all hours worked in a given week in excess of 40
hours."  [Herrington Ex. 73, at pp 12-13]

Now, through its new attorneys, Waterstone advances two
arguments in support of its claim to an OSE:  first, that as a matter of law it

could not waive its OSE defense, and second, that the evidence incorporated from the class-phase hearing is insufficient to sustain Herrington's estoppel claim.

Herrington's preliminary attempt to invoke the doctrine of "law of the case" falls short, because from the beginning of this individual phase, I have ruled that her claim must be evaluated anew, standing on its own. She can rely on evidence presented in the class hearing, but that evidence must be independently evaluated and subjected to independent legal analysis in this individual phase.

Waterstone argues that waiver is legally impossible because "no court has applied the concept of waiver to an exemption under the FLSA based on pre-litigation conduct".  It seeks to draw a distinction between waiver-type conduct before a claim is asserted and the well-established principle that as an affirmative defense it can be waived in the ensuing litigation.

In the circumstances here, after telling its LOs they were "non-exempt", Waterstone deliberately set up a system designed to prevent the LOs from obtaining the benefits of being "non-exempt" under the FLSA. It would defeat the primary purpose of the FLSA – protecting employees -- to

hold that such conduct did not imply from the very beginning an intentional relinquishment of the Waterstones' right to assert the OSE.

Given the many combinations of human interactions in life, it has sometimes been difficult for the law to distinguish exactly where, in a given set of circumstances, lies the boundary between the concepts of waiver and estoppel.  Here, even if that boundary should be deemed to be the commencement of Herrington's action against Waterstone, then the underlying misconduct of Waterstone's compensation system would appropriately be defeated by equitable estoppel, and contrary to Waterstone's argument, there is ample evidence here to apply such an estoppel against Waterstone's invoking the OSE defense.

Through its negotiations with Linda Hall to induce her to bring her group, including Herrington, into its organization, Waterstone promised Herrington the minimum wage plus overtime compensation, yet it directed or permitted its branch managers to discourage and prevent LOs, including Herrington, from reporting more than 40 hours and thus from receiving the overtime compensation to which they were entitled.

Waterstone contends that estoppel is an individualized inquiry and that Herrington did not rely to her detriment on Waterstone's promise of overtime compensation.  Yet she continued to work for Waterstone for

nearly nine months without receiving the compensation she had been promised and to which she was entitled.  Under all the circumstances here, to permit Waterstone to manipulate its LOs through its record-keeping practices would be unfair and unjust and would undermine the basic purposes of the FLSA.

Herrington's FLSA claims, therefore, are not defeated by Waterstone's claim to an Outside Sales Exemption.  Through its improper conduct with respect to reporting hours worked by its LOs, Waterstone waived and is estopped from asserting the OSE exemption as a defense to her claims.  Accordingly, Waterstone is liable to Herrington under the FLSA for her claims of unpaid wages, expenses, and overtime.

## Other Issues

### 1. <u>Unreimbursed Expenses</u>

Herrington is entitled to recover for expenses incurred in carrying out her work as an LO.  The underlying premise is that in any work week where she was paid only the minimum wage, any such expenses incurred but not reimbursed effectively reduced her compensation to below the minimum-wage level.  She claims an average weekly expense amount of $187.50.

Waterstone does not contest the reimbursement principle to be applied under the FLSA, but argues that Herrington failed to present evidence documenting her claimed expenses.

In reply, Herrington points out that Waterstone did not provide to its LOs any method for recording or reimbursing their expenses, but she credibly describes the nature of the expenses she bore – mileage, cell phone, marketing materials, hosting events and engaging in business meetings with clients or realtors –  expenses that were corroborated as having been necessarily incurred by other LOs.   In the class hearing, Herrington agreed to the stipulation of $100 per week in expenses. Following the principle established in *Anderson v. Mt. Clemens Pottery*, supra, I conclude that a just and reasonable estimate of Herrington's expenses would be $100 per week.

2.    **Arizona Law**.

Herrington seeks to recover treble damages under Arizona Revised Statute Sec. 23-355, which provides: "[I]f an employer . . . fails to pay wages due any employee, the employee may recover in a civil action against an employer . . .  an amount that is treble the amount of the unpaid wages."  She argues that "wages" includes both the minimum wage and

overtime, and that the "wages due" in this case are those required by the FLSA.  Herrington notes that she does not seek double recovery, so that "payment of treble damages under the Arizona statute would, necessarily, satisfy Waterstone's obligation to pay liquidated damages under the FLSA."

Waterstone correctly rejects this attempt to obtain additional damages under Arizona law, because the FLSA has preempted such a claim.  [*Wood. V. TriVita, Inc.,* 2008 WL 6566637 (2008) (at *4).  ("To allow Plaintiff to bring suit for a violation of the FLSA and seek a remedy other than that provided by the FLSA would stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress in enacting the FLSA.")  Accordingly, Herrington's Arizona law claim is denied.


**3.**   **Breach of Contract Claim**

Herrington asserts that she is entitled to recover minimum wages, expenses, and overtime under a contract theory grounded in the two employment agreements she executed.  Waterstone opposes the contract claims for a variety of reasons.

The obvious purpose of Herrington's contract claim when it was originally asserted in 2012 was to provide a backup to possible statute of

limitations issues under the FLSA for some of the class members, and to the possibility that she could lose the FLSA claims entirely as the result of an adverse ruling on Waterstone's OSE defense.  Herrington has no statute of limitations problems under the FLSA, and now that the OSE defense has been rejected and Waterstone has been found liable under the FLSA, the contract claims have become superfluous and there is no need to analyze the separate issues that Waterstone advances.  The contract claims are therefore dismissed as unnecessary.

**4.    Liquidated damages.**

In the circumstances of this case, I will allow to Herrington liquidated damages under her successful FLSA claims.  Waterstone's attempted good-faith defense to liquidated damages fails.  Its practice of permitting or directing its supervisors to prevent LOs from recording more than 40 hours per week was followed not in good faith, but for the very purpose of evading the overtime requirements of the FLSA.

5.    **Punitive Damages**

Herrington also seeks punitive damages, arguing that they can be allowed when a party tortiously interferes with another's contract rights.

She recounts Waterstone's "scorched earth" litigation tactics, false testimony, and deception.  The claim is denied.  Punitive damages for tortious interference with contract rights are allowed only when the interference is committed by a third party, not, as here, by a party to the contract.  Moreover, even if they were legally allowable, they are always discretionary, and in my discretion as arbitrator I would not award them in this case.

## 6    FLSA Damages

Herrington is entitled to recover damages under her FLSA claims for the period from January 28, 2011, to October 7, 2011.  Those damages include unpaid minimum wages, unreimbursed expense, and unpaid overtime, plus the FLSA liquidated damages.  At the hearing, Herrington presented her damage testimony through Jason Kandel, who created a complex spreadsheet and a computer program with which he calculated her damages, adopting the assumptions most favorable to her case, i.e., 70 hours per week worked, $187.50 per week in expenses, etc.  Mr. Kandel explained that, by using the computer program, I could adjust any of the items affecting damages based on what conclusions I might reach on the

various disputed issues.  The program would then automatically recalculate Herrington's damages to conform to the findings in my decision.

Regrettably, I am forced to the conclusion that Mr. Kandel overestimated my ability to operate his program, because  I am unable to manipulate the program so as to calculate the correct dollar amount of damages to be awarded to Herrington.  I therefore instruct Herrington to have Mr. Kandel recalculate Herrington's damages using the factors I have established in this decision.  He should then, by February 26, 2020, report back to me what those damages amount to, with a copy to Waterstone's counsel.  The report should also indicate what factors he changed and the amounts he arrived at for each item.  Waterstone may respond to his report by March 4, 2020, and Herrington then may reply by March 11th should she choose to do so.  I will then determine the amount of damages and enter an award.

## 7    Attorney's Fees and Costs

This issue has not yet been addressed by the parties.  I am prepared to award to Herrington, as the successful party, a reasonable attorney's fee and reimbursement for costs and expenses incurred in this arbitration. Naturally, if the parties can agree on an amount for such an award, I would

accept that amount.  Absent agreement, when the damages have been decided, we will set a schedule for determining the proper amount.

An issue that may arise is whether any part of the fees and expenses incurred in the class phase can be included.  My tentative conclusion on that issue is that because much of the evidence from the class phase was made a part of the individual phase, a reasonable amount for that part should be allocated for inclusion in the final computation of a reasonable attorney's fee.

## CONCLUSION AND PARTIAL AWARD ON LIABILITY

1. Waterstone is liable to Herrington under the FLSA for unpaid minimum wages and unpaid overtime based on a work week of 50 hours, and for unreimbursed expenses in the average amount of $100.00 per week.

2. Waterstone has waived and is estopped from asserting the "outside sales exemption" defense to Herrington's FLSA claims.

3. Herrington's claim under Arizona law is dismissed.

4. Herrington's claims under contract law are dismissed.

5. Herrington's damages shall be determined on the basis of the principles, findings, and conclusions described in this partial award.

6. Waterstone's contractual clawback process does not apply in calculating Herrington's damages under the FLSA.

7. Herrington is entitled to recover a reasonable attorney's fee and costs to be determined on motion on a schedule to be established.

8. This Partial Final Award on Herrington's individual claim shall remain in full force and effect until such time as a Final Award is entered.

Dated:  February 20, 2020

George C. Pratt
Arbitrator

State of New York
County of Nassau

On this 20th day of February, 2020, the above arbitrator appeared before me and confirmed to me that he is the individual described herein and acknowledged to me that he is the individual who executed the foregoing instrument.

Notary Public
State of New York.

CLIFFORD PAUL CHABINA
Notary Public, State of New York
No. 304723215
Qualified in Nassau County
Commission Expires Mar. 30, 2022

29